UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| ) | C.A. No. 07-12213-PBS |
| CHARLES D. FOLEY, JR., ) | |
| Plaintiff ) | |
| ) | |
| v. ) | |
| ) | |
| TOWN OF RANDOLPH, ) | |
| RICHARD W. WELLS, in his official ) | |
| capacity, ) | |
| PAUL J. CONNORS, in his ) | |
| official capacity, ) | |
| WILLIAM ALEXOPOULOS, in his ) | |
| official capacity, ) | |
| MAUREEN C. KENNY, in her ) | |
| individual and official capacities, and ) | |
| JAMES F. BURGESS, JR., in his ) | |
| individual and official capacities, ) | |
| Defendants ) | |

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF CHARLES D. FOLEY, JR'S, MOTION FOR SUMMARY JUDGMENT

### I. INTRODUCTION

On September 17, 2007, Defendants retaliated against Plaintiff Charles D. Foley, Jr., (hereinafter "Plaintiff" or "Foley"), by suspending him as Fire Chief, because he made comments of public concern at the scene of a fatal fire on May 17, 2007. Foley claims this retaliatory disciplinary action violated his speech rights, the Whistleblower Act, and the "strong" Fire Chief statute (Counts I-IV). Foley also claims Defendants James F. Burgess, Jr. ("Burgess), and Maureen C. Kenny ("Kenny") intentionally interfered with his economically advantageous relationship with the Town. (Count V).

Foley moves for summary judgment on Counts I-IV on the grounds that there are

no material facts in dispute, and he is entitled to judgment as a matter of law. Local Rule 56.1.

## II. <u>STATEMENT OF UNDISPUTED FACTS</u>

Foley incorporates his Local Rule 56.1 Statement of Undisputed Material Facts ("SOF"), on which there are no genuine issues to be tried.  A brief summary follows:

1.      Foley has been Chief of the Randolph Fire Department for 5 years and a firefighter for 30 years.  In 1993, the Commonwealth awarded him the highest award for firefighters, the Medal of Honor, for rescuing two children from a house. SOF 1-2. Governor Romney appointed, and Governor Patrick reappointed, Foley to the 13-member Massachusetts Fire Training Council, which is the sole certifying agency for certification of all levels of fire service personnel in the Commonwealth.  Randolph Selectmen proclaimed October 20, 2006, as "Chief Charles D. Foley Day," in celebration of Foley being named Fire Chief of the Year. SOF 2.

2.      Foley's official job duties have never included making public statements on matters concerning public safety, fire service, or the Department. SOF 3-7.

3.      Selectmen, the appointing authority for the Fire Chief, rejected Foley's proposal, during 2006 contract negotiations, that as part of his official job duties he would have the authority to make public statements on issues concerning public safety or risk.  The rejected provision provides:

> "In addition, the FIRE CHIEF shall have the authority to make public statements on any matters which may affect the public as they may apply to public safety, potential dangers, policy/community relations, proposed legislation, or other issues affecting or related to risk as it exposes the citizenry and any issues affecting or related to public safety, fire service or the fire department generally." SOF 4-5.

2

4.      Following unsuccessful contract negotiations in 2006, the Board re-appointed Foley, pursuant to the "strong" Chief statute, G.L. c. 48, § 42.  This authorizing statute does not require Foley, as part of his job duties, to speak with reporters, give interviews, or make public statements on matters affecting the public.  The only discipline authorized by the statute is removal for "cause." SOF 6-7, 10.

5.      In addition to performing his statutory duties, Foley, upon occasion, voluntarily answers media inquiries or makes public statements to the media. SOF 26.

6.      By 2006, the Department's emergency runs had more than doubled to 8,236 from 3,989 in 1980; the number of firefighters per shift had fallen from 14 to 10. By 2007, the number of positions had declined to 50, from 55 in 2002. SOF 16-18.

7.      In January 2007, a Town committee found that reductions in firefighters increased risk for those who remain, and under-manned trucks reduce firefighters' ability to effectively perform their tasks.  The National Fire Protection Association sets 4 fire-fighters per engine truck and 4 per ladder truck, as standard for emergencies. SOF 19-21.

8.      For five years, Foley has advocated for restoration of the lost positions per shift, to the Finance Committee, Selectmen, and the Town meeting, objecting to the lost positions' impact on firefighters' effectiveness and the public's safety. SOF 15, 22-23.

9.      In March 2007, voters defeated a Proposition 2-1/2 override petition that would have restored $108,000 to the Department budget the next fiscal year. SOF 24.

10.     At 5:00 a.m. on May 17, 2007, Randolph firefighters responded to a fire at a one-family residence.  The first truck arrived with 3 firefighters, and the ladder truck had only 1 firefighter – a number well below national standards for emergencies. SOF 29.

11.    The fire had a huge start and was so intense with "overlapping" fire that Town firefighters first on the scene had to conduct a "defensive" operation, pushing the fire back into the wood frame house, and wait for reinforcements from other towns before they could bring the fire under control to enter the house, search, and rescue. SOF 30-32.

12.    Two young brothers, trapped in a second floor bedroom, died. SOF 33.

13.    Foley voluntarily answered inquiries from the press at the fire site. He noted the first response team was comprised of only 10 firefighters, instead of the usual complement of 12. He stated that although he could not say that the outcome would have been different, the firefighting operation would have gone more professionally and more according to standard if there had been more manpower. Foley observed that Randolph, like many towns, has suffered a lack of funding, which equates to understaffing. SOF 34.

14.    Burgess and Kenny appeared at the fire scene. Upset about the deaths, Foley referred to the manpower cuts and pushed a reporter's drafted news article towards Burgess. Burgess took offense and claimed Foley shoved the article into his sternum. Later that day, Kenny criticized Foley for discussing staffing and budget issues at the fire site and not focusing on the children's deaths and the firefighters' heroism. SOF 37-39.

15.    The President of the Fire Chiefs' Association of Massachusetts told a Boston Globe reporter, there is "a direct correlation between the number of people who arrive on the scene to fight a fire and how quickly they can make entry into a building, advance hose lines, perform search and rescue, do ventilation, and provide safety teams for firefighters inside... ." Like Foley, he suggested that two additional firefighters "would have made a positive impact." SOF 40.

4

16.     Foley's statements that although he did not know if the outcome would have been different with a full team of first responders, their effectiveness would have been enhanced, triggered public discussion. Citizens publicly pondered the impact of the failure of the Proposition 2-1/2 override on public safety and whether lack of resources had hindered firefighters' response to the blaze. Fire Chiefs commended Foley for publicly recognizing that fire departments had dwindled to unsafe levels. SOF 42-43.

17.     Burgess and Kenny brought disciplinary charges against Foley, claiming he "made public statements to the media and others which demonstrated a lack of sound judgment and of accuracy and which were not conducive to the town's mission of providing effective fire protection services."[1] SOF 45.

18.     Following a 3-day hearing, the hearing officer, who was selected and paid by the Town, concluded that despite the fact that Foley's tactical response to the fire amounted to textbook fire fighting, his pushing the news article towards Burgess and statements to the media at the fire scene were "unprofessional, inappropriate, and unbecoming to a fire chief." He also concluded the comments were motivated to bring staffing and budgetary issues to the public through the media. SOF 46, 55.

19.     Burgess, Kenny, and a third Selectman voted 3-2 to suspend Foley for 15 days, and he lost $6,100 in salary during the suspension. SOF 57.

20.     The Patriot Ledger referred to "the charges and hearing as nothing more than a kangaroo court," which had "fractured the residents." SOF 61.

21.     On April 1, 2008, Randolph voters turned out in the greatest number since 1982 to pass the Town's first-ever Proposition 2-1/2 override. The override for the Fire

---

[1] Although they brought two other charges against Foley, one of which the hearing officer supported, the **individual Defendants have made it clear** in their answers to interrogatories that **they suspended Foley because of his public comments about the May 17, 2007 firefighting efforts.** See SOF 45, 55, 58.

Department passed with more than two-thirds of the vote and provided $200,000 for four additional firefighters. SOF 63-68.

## III. ARGUMENT

## A. PLAINTIFF'S PUBLIC COMMUNICATION WAS PROTECTED SPEECH

Foley's comments about staffing and firefighting effectiveness were protected by both the First Amendment and Part 1, Art. 16 of the Massachusetts Constitution (Counts I, II). To establish his constitutional speech claims, Plaintiff must prove that (1) he made the comments as a citizen and not as part of his official duties; (2) the remarks were a matter of public concern; (3) his interest in commenting upon those issues outweighed the Town's interest in the efficient performance of public services; and (4) Plaintiff's protected speech was a substantial or motivating factor in his suspension. Taylor v. Town of Freetown, 479 F. Supp. 2d 227, 236-237 (D. Mass. 2007); Hegarty v. Tortolano, 2006 U.S. Dist. LEXIS 11191. *4 (D. Mass. 2006). Foley will also establish that Defendants cannot meet their burden of proving they would have suspended Foley, in the absence of his protected speech, and that the law protecting Foley's speech was clearly established.

### 1. Communication with the Press about Firefighting Effectiveness Was Not Part of Plaintiff's Official Duties

The holding of Garcetti v. Ceballos, 547 U.S. 419, 424 (2006), is inapplicable to the facts of this case. In Garcetti, the Supreme Court held that the First Amendment does not prohibit managerial discipline based on a public employee's communication made pursuant to the employee's official job responsibilities. Garcetti, 547 U.S. at 424.[2] Unlike Garcetti, whose job was to write the memo which he claimed was protected speech, Foley's comments were not made pursuant to his duties as Fire Chief. SOF 3-7.

---

[2] Even if the holding, in Garcetti v. Ceballos, a First Amendment case, applied to the facts of this case (it does not), it would not be dispositive of Count II, brought pursuant to the Massachusetts Constitution.

Foley's job duties are limited to the employer's reasonable expectations of what is required by the position of Fire Chief. Garcetti, 547 U.S. at 424-425. The Town did not hire Foley to make public statements, and he was not required to make public statements as part of his job duties. Indeed, just months before the May 2007 fatal fire, the **Board** of Selectmen had specifically **declined to authorize Plaintiff**, as part of his job duties **to make public statements concerning public safety**, potential dangers, or related issues. G.L. c. 48, § 42, also does not require a chief, as part of his job duties, to speak with reporters or make public remarks on any matters which may affect the public. SOF 4-7.

The fact that Plaintiff's communication was related to the subject matter of his employment does not deprive it of First Amendment protection:

> "The memo [in Garcetti] concerned the subject matter of Ceballos'
> employment, but this, too, is nondispositive. The First Amendment
> protects some expressions related to the speaker's job. As the Court
> noted in Pickering: 'teachers are, as a class, the members of a community
> most likely to have informed and definite opinions as to how funds
> allotted to the operation of the schools should be spent. Accordingly, it
> is essential that they be able to speak out freely on such questions
> without fear of retaliatory dismissal.' The same is true of many other
> categories of public employees." Garcetti, 547 U.S. at 421.

Chief Foley was the Randolph citizen most informed about firefighters' effectiveness in responding to the fire, and he made the personal choice to answer media inquiries on May 17, 2007. While he believed the interviews served his duty to keep the Town apprised about the condition of the Department, agreeing to interviews was neither required nor prohibited by his job duties. SOF 35; Snelling v. City of Claremont, 155 N.H. 674, 681, 931 A.2d 1272, 1280 (2007) (while citing to Garcetti to recognize one's job description does not compel a particular finding, holding that the city tax assessor's

job description does not support the defendants' claim that his comments about the fairness of the tax system were part of his job duties).

Foley's opinions were not articulated on behalf of the Town, but as his own point of view, just as other fire officials interviewed expressed their points of view. SOF 34-35, 40. The fact Foley was in uniform does not convert his speech as a citizen into speech as an employee. Brasslett v. Cota, 761 F.2d 827, 831, 846 (1st Cir. 1985) (where fire chief gave interview while in dress uniform about adequacy of fire vehicles, raising matter of public concern, speech was protected); Reilly v. City of Atlantic City, 2008 U.S. App. LEXIS 13808, *35, 37 (3rd Cir. July 1, 2008) (although the speech at issue stemmed from the police officer's official duties in investigation, his truthful testimony in court constituted citizen speech and is foreclosed by the "official duties" doctrine enunciated in Garcetti).

The plaintiff in Garcetti "wrote his disposition memo because that is part of what he, as a calendar deputy was employed to do," and if he had declined to prepare the memo, he would have been appropriately subject to discipline for failing to perform a required function. 547 U.S. at 421. By contrast, it is inconceivable that Foley would have been subject to discipline had he declined to speak with the media because there was no reasonable expectation or requirement of his employer that he do so. SOF 4-7; Garcetti, 547 U.S. at 424 (rejecting the suggestion that employers can restrict employees' rights by creating broad job descriptions).

## 2. Foley's Communication Was a Matter of Public Concern

Foley's speech concerns political matters at the core of activity protected by the First Amendment. McIntyre v. Ohio Elections Comm'n, 115 S. Ct. 1511, 1518-1519

(1995) (speech on public issues "occupies the core of the protection afforded by the *First Amendment*"). Courts agree that few subjects are of more public concern than the provision of basic fire and rescue services. See, e.g., Beckwith v. City of Daytona Beach Shores, 58 F.3d 1554, 1564 (11th Cir. 1995) (regarding public opposition to budget-cuts and discontinuance of paramedic program, "It is hard to imagine any combination of government interests sufficient to outweigh Appellant's strong interest in informing the public about policies he believed were dangerous to the City's citizens"); Brasslett, 761 F. 2d at 844. (Fire Chief's comments about the condition of vehicles and funding are the "very type of public discourse that our Constitution actively seeks to preserve").

To determine whether an employee was speaking as a citizen upon matters of public concern or as an employee upon matters only of personal interest, courts often consider "the content, form, and context of a given statement, as revealed by the whole record." Connick v. Myers, 461 U.S. 138, 147-148 (1983). However, where, as here, the public interest of Foley's remarks is apparent from the content alone, and no personal interest or gain has ever been alleged, courts give little weight to the form and context of the speech. SOF 47-48; Jordan v. Carter, 428 F.3d 67, 73 (1st Cir. 2005) (subject matter of speech may alone resolve public concern question); Hegarty v. Tortolano, 2006 U.S. Dist. LEXIS 11191, *11-12 (D. Mass. 2006) (firefighters' petition about the quality of life support services provided to the City "clearly addressed a matter of inherent public concern," and subject matter alone resolves the public concern question).

### 3..<u>Foley's Right as a Citizen to Comment upon Matters of Public Concern  Relating to Randolph's Firefighting Effectiveness Far Outweighed the Interest of the Town as the Employer</u>

Under <u>Pickering v. Board of Education</u>, 391 U.S. 563, 568 (1968), in cases involving speech on matters of public concern, a balance between interests must be drawn.  The First Circuit has defined the balancing procedure:

> "We are required to balance the value of an employee's speech – for both the employee's own interest and the public interest in the information the employee seeks to impart – against the employer's legitimate government interest in 'preventing unnecessary disruptions and inefficiencies in carrying out its public service mission.'" <u>Perez v. Pierluisi</u>, 339 F.3d 43, 52 (1st Cir. 2003) (citation omitted).

There is no evidence, and Defendants have never claimed, that Foley's public communication resulted in any harm to the operational efficiency of the Fire Department or resulted in a disruption of harmony or discipline in the Department.[3] SOF 47-48.  Not a single firefighter testified that s/he disagreed with Foley's statements or that his public comments caused a disruption of the harmony and the discipline of the Fire Department. SOF 48.  Foley's speech was not directed against Randolph firefighters, or even Selectmen, but rather, the comments were made for the benefit and edification of Randolph residents. SOF 34-35; <u>Brasslett v. Cota</u>, 761 F.2d at 845 (where speech of Fire Chief was not a "personal attack upon anyone with whom he was required to work on a daily basis," either in "content or tone," speech did not erode harmony or discipline).

Even after a 3-day hearing, the hearing officer could only speculate, in the absence of any evidence, that Foley's comments "have a <u>potential</u> for eroding public confidence in fire protection services for the citizens of Randolph and a <u>potential</u> for further exacerbating emotional trauma to the grieving family members." SOF 55

---

[3] In March 2008, the individual Defendants claimed, for the first time, that Foley's public communication could "create <u>potential</u> morale problems in the Fire Department." SOF 58 (emphasis added).

(emphasis added); <u>Rankin v. McPhearson</u>, 483 U.S. 378, 389 (1987) (the harm to the government's interest cannot be merely hypothetical); <u>Brasslett v. Cota</u>, 761 F.2d at 845 (stressing that where First Amendment rights are concerned, "'operational efficiency objections must be real and important before they can serve as a basis for discipline or discharge of a public employee'") (citation omitted).  Not only does this rank speculation lack evidence of harm to the operational efficiency of the Fire Department, Selectmen, or Town government, but the statement is inapposite.  Existing case law focuses on the confidence and trust between employer and employee, not between a third-party resident and an employee. <u>Hegarty</u>, 2006 U.S. Dist. LEXIS at *14.

The First Circuit case, <u>Brasslett v. Cota</u>, is on point and is dispositive of this case. In <u>Brasslett</u>, the Fire Chief answered a television interviewer's questions about the number and condition of the Department's vehicles.  Defendants claimed the comments were recklessly false because they implied the Town and the Town Council had taken no action to improve the fire equipment, even while Brasslett knew that specifications for a fire truck had been approved and bidding would likely begin soon. 761 F.2d at 842. Similarly, in Randolph, Selectmen defensively alleged that Foley's public statements about the undermanned Fire Department "demonstrated a lack ...of accuracy."[4] SOF 45. They based this claim on the fact that the Department had $100,000 budgeted for

---

[4] Following the hearing and Foley's suspension, The Patriot Ledger opined: "The most damning problem, then, apparently was Burgess' and Kenney's embarrassment that Foley aired the town's dirty laundry in honestly answering reporters' questions that the staffing levels in Randolph put the firefighters in a defensive posture rather than allowing them the ability to enter the...home to save brothers...who were trapped in a second-floor bedroom..." SOF 59.  On another occasion when Selectmen evidenced embarrassment, the Police Chief advised them that instead of blaming the media for its coverage of increased youth violence, the Town should attack the problems that are the subject of the newspaper articles. SOF 62.

overtime pay and $46,000, which they alleged Foley could have spent on two new firefighter positions.[5] SOF 55.

The Brasslett Court found that the interview, read in its entirety, negated any inference that the Fire Chief was attempting to misrepresent the extent of the Town's fire equipment. Brasslett, 761 F.2d at 843. Of more importance, the Court held that even assuming, arguendo, that at least one of Brasslett's statements was negligently false, the remarks were "clearly protected speech:"

> "That Brasslett's interview may have been somewhat critical of the Town or the Council hardly strips it of *First Amendment* sanction. The Amendment was calculated to protect precisely this type of speech, since it is likely the government would be motivated to stifle only critical, revealing, or embarrassing remarks. Likewise, the mere fact that the statements were erroneous does not remove them from the Constitution's protection; erroneous remarks are an inevitable by-product of unrestrained public debate. To deny protection to false statements negligently made would chill discourse altogether." Brasslett, 761 F.2d at 844, citing, Gertz v. Robert Welch, Inc., 418 U.S. 323, 340-341 (1974).

In light of voters' March 2007 rejection of the Proposition 2-1/2 override, Foley's public comments were directed to Town residents, not to Selectmen, as such. Foley specifically stated he was trying to communicate with Town residents through the media:

> "We work together to accomplish goals, they train to work in teams and as a result of the erosion of our teams, you know, it's difficult to accomplish tasks. As many of you are here today you have the resources to bring this information to the public. You work in a teamwork setting yourselves and without some part of your team it would be difficult for you to accomplish your job today too." SOF 35.

---

[5] Defendants' contention that Foley's statement about staffing below standards was inaccurate because he could have appointed additional firefighters is not supported by the evidence. At most, Defendants and Foley held different opinions about how the $146,000 should have been allocated. Foley testified that the $100,000 budgeted for overtime would be required during the summer months when vacation time spiked. He also testified that given voters' March 2007 rejection of the Proposition 2-1/2 override and projected potential layoffs, he did not hire an additional firefighter who could not be supported in subsequent years. SOF 27.

Selectmen's embarrassment about Plaintiff's public speech was not only misplaced but also resulted in a public hearing and Foley's suspension, which contributed significantly to erosion of the public's confidence in Town government and/or of trust between the Board and Foley. SOF 50-53, 59-61; <u>Hegarty</u>, 2006. Dist. LEXIS at *15 ("Indeed, could it be that defendants' reactions to the speech, rather than the speech itself have contributed at least as much, if not more, to any...erosion of trust?").

### 4. Chief Foley's Speech Was a Substantial or Motivating Factor in his Suspension and Defendants Would Not Have Otherwise Suspended Him

Selectmen suspended Foley based on the recommendation of the hearing officer, who concluded that Foley pushed a draft <u>Patriot Ledger</u> news article to Burgess' chest and allegedly made statements on May 17, 2007 that were "unprofessional, inappropriate, and unbecoming a fire chief." SOF 55.

In answers to interrogatories, Defendants admit the pushing of a draft article towards Burgess' chest, alone, would not have provided grounds for Foley's suspension, and Foley's public comments were a "substantial or motivating factor" in his suspension. <u>Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle</u>, 429 U.S. 274, 287 (1977). Specifically, in Interrogatory No. 22, Plaintiff inquired, and Defendants answered, as follows:

> "Identify each and every purpose, pursuant to your understanding of the parties and the situation, (a) for which Defendants Kenny and Burgess brought disciplinary charges against Plaintiff and/or (b) for which the Board voted to suspend Plaintiff's employment." SOF 58 & Exhibit 3.

> Answer No. 22

> ...Notwithstanding the foregoing objection and without waiving same, on May 17, 2007, during an official press conference at the scene of a fatal fire at 290 Union Street, Randolph, Massachusetts, plaintiff...with respect to responding to media inquiries concerning the fire, made statements which...were

intemperate, they indulged in innuendo and speculation regarding the cause of the two fatalities prior to conclusion of the State Fire Marshal's investigation, and because, as an expert witness called by plaintiff confirmed, it was inappropriate for plaintiff to deliberately raise staffing and budgetary issues through the media at a fatal fire scene. In addition, those statements had the potential to unnecessarily exacerbate the emotional trauma of the families who were grieving two fatalities. Plaintiff also failed to express any remorse at the scene about the two fatalities or to commend the firefighters for their heroic efforts combating the fire. Plaintiff's statements, improperly connecting the budget and staffing issues to the fatalities without any supporting evidence produced by a competent investigation, had the potential to erode public confidence in the Town's ability to provide fire protection services and to create potential morale problems in the Fire Department. Furthermore, those statements were in my opinion misleading as (despite the content of his statements) plaintiff had funds available in the Fire Department budget to make additional hires and to pay additional overtime, but had chosen not to do so.[6] SOF 58.

Notably, this answer, repeated by all Selectmen, does not mention the Burgess incident and makes it clear that Foley was disciplined "because he raised questions as to the adequacy of [Randolph's] fire protection to the public, thereby embarrassing the [Selectmen]." SOF 58; Brasslett, 761 F.2d at 846 (protected comments shall not yield to employer's interest in averting embarrassment). Thus, Foley's public communication was a "substantial or motivating," if not the sole, factor in his suspension, and Defendants cannot prove by a preponderance of the evidence, that the Board would have suspended Foley, even in the absence of his protected speech. Mullin v. Town of Fairhaven, 284 F.3d 31, 36 (1st Cir. 2002) (where speech was protected, the burden shifts to defendants to prove by a preponderance of evidence that they would have taken the same action, even in the absence of protected speech). Mt. Healthy, 429 U.S. at 287.

---

[6] Plaintiff did not call any witness at the hearing who was an expert on First Amendment speech rights. One fire chief witness opined that he does not believe it is appropriate to raise staffing and budgetary issues at the scene of a fatal fire. SOF 54. In fact, as Town residents and Selectmen understood, Foley's remarks were, at core, about firefighter effectiveness and the public's safety.

5. **Chief Foley's Constitutional Right to Speak Publicly Was Clearly Established**

The First Circuit decided the cogently analogous case, Brasslett v. Cota, 22 years

before Defendants' violated Foley's constitutional right to speak publicly about the

adequacy of Randolph's fire protection. 761 F.2d 827, 846 (1st Cir. 1985). The Brasslett

Court reversed summary judgment for the defendants and held that the Fire Chief's

public comments about the adequacy of the town's fire protection, even if erroneous,

were the exact type of discourse the Constitution seeks to preserve. 761 F.2d at 844, 847.

Both the Pickering balancing test, and the First Circuit's application of the test to

an analogous fact pattern had long been established when the Board suspended Foley in

2007. Pickering (1968); Brasslett (1985); Stewart v. Baldwin Co. Bd. of Educ., 908 F.2d

1499, 1504 (11th Cir. 1990) (Officials need not predict future constitutional law, but are

required to relate established law to analogous factual settings.); Putnam v. Town of

Saugus, 365 F. Supp. 2d 151, 178 (D. Mass. 2005) (the law is clearly established that a

public officer cannot retaliate because of an employee's protected speech).

Based on the striking similarity between the facts in Brasslett and the facts in this

action; that is, two fire chiefs commenting in media interviews about the adequacy of

town fire protection, a reasonable official in the Defendants' position would be expected

to know that imposing disciplinary action upon Foley, under the circumstances, would

violate his constitutional rights.[7] Lynch v. City of Boston, 989 F. Supp. 275, 289 (D.

Mass. 1997) (cogently analogous cases may establish a right). Accordingly, any claim of

---

[7] The First Circuit has opined that where a balancing test is used, it may be difficult for officials to know when they have violated "clearly established" law. Fabriano v. Hopkins, 352 F.3d 447, 457 (1st Cir. 2003). The Court has recognized, however, that, in light of the pre-existing law in some cases, such as in this case, the unlawfulness is apparent, notwithstanding Pickering. Id. at 457-458; Savard v. Rhode Island, 338 F.3d 23, 27 (1st Cir. 2003) (the reasonableness of the conduct is determined by the countours of the law at the time of the action). Here, the very action in question had been held unlawful for 22 years. Brasslett, 761 F.2d at 844-846.

qualified immunity by the Defendants in this action is without support and must be rejected. <u>Reilly v. City of Atlantic City</u>, 2008 U.S. App. LEXIS at *41-43 (affirming denial of summary judgment on the basis of qualified immunity where law was clearly established at the time of the alleged retaliation).

### B.    DEFENDANTS VIOLATED THE WHISTLEBLOWER ACT

The Whistleblower Act provides: "(b) An employer shall not take any retaliatory action against an employee because the employee does any of the following:

> (1) Discloses…to a supervisor…a policy or practice of the employer…that the employee reasonably believes poses a risk to public health, safety or the environment;

> (3) Objects to…any activity, policy or practice…which the employee reasonably believes poses a risk to public health, safety or the environment." G.L. c. 149, § 185.

To succeed on his claim under the Whistleblower Act, Plaintiff must show that (1) he engaged in protected activity known to Defendants; (2) he suffered an adverse employment action; and (3) there was a causal connection between his protected activity and the adverse action. <u>Lipchitz v. Raytheon Co.</u>, 434 Mass. 493, 502 (2001).

**Protected Activity.** As a "strong" Fire Chief, pursuant to G.L. c. 48, § 42, Foley is legally mandated to protect "life and property in case of fire" in the Town and to "report to the town the condition of the department with his recommendations." § 42. For five years Foley provided reports to the Town in which he objected to the negative impact of staff reductions on firefighting effectiveness and residents' safety. SOF 23.  He repeatedly requested that 5 positions eliminated after 2002 be restored to the safer level.

16

Notwithstanding, Foley's reports and recommendations, firefighter positions were not restored, and in March 2007, Town voters rejected a Proposition 2-1/2 override, which would have supported additional firefighter positions. SOF 22, 24.

On May 17, 2007, following a harrowing fire that killed two young boys, Foley voluntarily spoke with media personnel about the fire.  He reasonably believed that the current staffing level posed a risk to public safety, and he publicly communicated his opinion that the fact that the first response team was comprised of only 10 firefighters, instead of a full complement of 12, may have affected the Department's ability to fight the fire.  On that same day, he objected to the reduction in firefighters to Kenny and Burgess, his nominal supervisor(s). SOF 34-38.

After Foley reported to Town public bodies, disclosed to Town residents, and objected to his supervisor(s) that budget and manpower reductions had undercut firefighters' effectiveness in responding to fires, activity that was protected by G.L. c. 48, § 42, as well as by federal and state constitutional law, Defendants unlawfully retaliated by suspending Foley, without pay, for 15 days. SOF 15, 34-38, 57; G.L. c. 48, § 42.

**Adverse Employment Actions**.  The disciplinary charges, public hearing, and 15-day suspension constituted adverse employment actions, which caused Plaintiff harm, including loss of $6,100 in salary. SOF 57; G.L. c. 149, § 185 (a) (5).

**Causation**.  Burgess and Kenny brought disciplinary charges soon after Foley privately complained to them, and publicly communicated with residents, about staffing that did not allow the first responders to enter the blazing residence to save two brothers. Dirraine v. Brookline Police Dep't, 315 F.3d 65, 72-73 (1st Cir. 2002) (("[I]t is apparent that an <u>oral</u> disclosure to a supervisor is protected outright against retaliation").  Foley,

who was statutorily mandated to protect life and property in case of fire, disclosed risk to public safety, in compliance with this mandate. G.L. c. 48, § 42. Defendants, in turn, admit they suspended Plaintiff because he engaged in the protected activity of complying with his statutory mandate. Accordingly, Defendants' retaliatory discipline of Foley because of these protected activities contravened the Whistleblower Act. SOF 58.

## C.   DEFENDANTS VIOLATED THE "STRONG" CHIEF STATUTE

Pursuant to G.L. c. 48, § 42, Foley may remain Chief for so long as Selectmen do not discharge him for "cause:" "…He may be removed for cause by the selectmen at any time after a hearing. …" The plain language of the statute makes no provision for an alternative form of discipline. Id.

Selectmen, at no time, have discharged Foley for cause. The SJC held in, McSweeney v. Town Manager of Lexington, 379 Mass. 794, 798 (1980), that "'cause' under the Town Manager Act includes any ground asserted in good faith which is not arbitrary, irrational, unreasonable, or irrelevant to the town manager's task of ensuring efficient management of the town." In suspending Foley, Selectmen not only imposed an unauthorized disciplinary action, they also relied on irrelevant and unreasonable grounds.

First, Defendants' suspension of Foley because they regarded his public remarks about the adequacy of Town fire protection to be "unprofessional, inappropriate, and unbecoming a fire chief" was wholly irrelevant to Foley's "charge of extinguishing fires in the town and the protection of life and property in case of fire." G.L. c. 48, § 42. On May 17, 2007, Foley executed this charge professionally and by the book. SOF 55.

Second, Defendants' claimed umbrage about Foley's public remarks was arbitrary, irrational, and/or unreasonable in that it was based in their embarrassment by

Foley's admission that the Department was forced, at first, to take a defensive posture

against the fire. SOF 59. Two dead children were "the elephant in the room," and Foley

was the citizen most qualified to opine about the Department's effectiveness in fighting

the fire and to tackle the question of how effectiveness may have been enhanced.[8]

Indeed, Foley's personal decision to speak publicly to Town residents on May 17, 2007,

and to proffer his opinions about the fire, manpower levels, and firefighter effectiveness,

triggered public discourse about the impact of the March 2007 budget- override defeat.

SOF 42. This public discourse, in turn, may have contributed to the first-ever budgetary

override in 2008, which enabled the hiring of four additional firefighters. SOF 42, 63-68.

In contrast to Foley's candor, Defendants' modus operandi has been to blame

others, in this case Foley, for airing facts they deem embarrassing, instead of addressing

the problem. SOF 59. On another occasion, Selectmen responded to media reports on the

problem of youth violence in Randolph by criticizing the media for allegedly making the

community look bad. SOF 62. Kenny and Burgess even suggested that residents cancel

their subscriptions and not advertise in offending publications. The Police Chief

encouraged the Selectmen to focus on the problem, not the media. SOF 62. In this case,

Defendants' unauthorized suspension of Foley, because they were embarrassed, was as

arbitrary as it was unlawful.

## IV. **CONCLUSION**

---

[8] In suggesting that the "cause of the two fatalities" would be determined by the Fire Marshall and stating that Foley should have awaited the Marshall's findings before commenting, Defendants erroneously confuse the State Fire Marshall's investigation of the cause of the fire with Foley's knowledge about the firefighters' effectiveness in fighting the fire and rescuing the boys. Exhibit 3, at No. 22. The Marshall's findings would have no effect on how quickly the Department brought the fire under control to enter the residence.

For the foregoing reasons, Plaintiff Charles Foley respectfully requests that the Court rule, as a matter of law, that the Town and individual Defendants violated Plaintiff's First Amendment and Massachusetts constitutional speech rights, and violated Plaintiff's rights, pursuant to the Whistleblower statute and the "strong" Fire Chief statute.

Respectfully submitted,

Charles D. Foley, Jr.
By his attorneys,


_____/s/ Kevin G. Powers_____
Kevin G. Powers, BBO #405020
Linda Evans, BBO #635078
Rodgers, Powers & Schwartz LLP
18 Tremont Street
Boston, MA 02108
(617) 742-7010


## CERTIFICATION OF SERVICE

I hereby certify that on this 16th day of July, 2008, the foregoing Memorandum of Law was filed through the ECF system and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing.


_____/s/ Kevin G. Powers_____
Kevin G. Powers